1

2

3

4

5

6                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
7                              AT SEATTLE

8   CHRISTOPHER LEON SMITH,

9              Plaintiff,                    CASE NO. 3:21-cv-5636-TMC-BAT

10        v.                                 **REPORT AND**
                                             **RECOMMENDATION**
11  STATE OF WASHINGTON,
    WASHINGTON STATE DEPARTMENT
12  OF CORRECTIONS, ROBIN SMITH,
    JULIA BARNETT, JACK WARNER,
13  ADELAIDE HORNE, ELKE JACKSON,
    AREIG AWAD, CO PRUITT, DEBORAH
14  TONHOFER, CO WHITE, JON REYES,
    RN3 HAWKINS, CARLEEN GRIMES,
15  DWAYNE EVANS, JENNIFER MEYERS,
    JO PHILLIPS, F. JOHN SMITH, RN
16  TRENER and DOES I-X inclusive,

17             Defendants.

18        Defendants Robin Smith, Julia Barnett, Jack Warner, Adelaide Horne, Elke Jackson,

19  Areig Awad, Cory Pruitt, Deborah Tonhofer, Tim White, Jon Reyes, Kenny Hawkins, Carleen

20  Grimes, Dwayne Evans, Jennifer Meyers, Jo Phillips, F. John Smith (deceased), Trina Ralston,

21  State of Washington, and Washington State Department of Corrections ("DOC") (collectively

22  "State Defendants") seek summary judgment dismissal of all Plaintiff's claims. Dkt. 40. Plaintiff

23  Christopher Smith seeks partial summary judgment on his negligence claims. Dkt. 43.

REPORT AND RECOMMENDATION - 1

1    Based on the parties' filings, summary judgment evidence, and balance of the record, the

2    Court finds the motions may be resolved without oral argument and recommends the motions be

3    granted in part and denied in part.

4                                    PROCEDURAL BACKGROUND

5         Plaintiff brought this lawsuit in Thurston County Superior Court and Defendants

6    removed it to this Court on August 31, 2021. Dkt. 1; 1-1. Plaintiff alleges the DOC and DOC

7    medical staff failed to control his diabetic condition, which delayed his back surgery and

8    worsened his chronic low back condition. Plaintiff asserts: (1) 42 U.S.C. § 1983 (Eighth

9    Amendment – deliberate indifference); (2) 42 U.S.C. § 1983 (First Amendment –retaliation); (3)

10   common law negligence; (4) negligent infliction of emotional distress; (5) RCW 18.71 – medical

11   malpractice; (6) failure to supervise; and (7) *respondeat superior*.

12        Plaintiff's motion is supported by his declaration and the declarations of Plaintiff's

13   expert, Dr. Philip Levin, a certified endocrinologist and internal medicine doctor, and Plaintiff's

14   counsel. Dkts. 44, 45, 46. Attached to counsel's declaration are excerpts of depositions of Dr.

15   Mary Ann Curl, Defendants Jo Philips and Adelaide Horne, Dr. Andrew Bieber (Plaintiff's

16   surgeon), the DOC Health Plan, and a 7/25/2019 Medical Primary Encounter Report. Dkt. 46.

17        Defendants' motion is supported by an excerpt of Dr. Bieber's deposition. Defendants'

18   opposition to Plaintiff's motion is supported by the same excerpt from Dr. Bieber's deposition,

19   excerpts from the deposition of Dr. Curl, and Behavioral Reports. Dkt. 47. Defendants do not

20   dispute the facts or evidence submitted by Plaintiff and none of the moving defendants submitted

21   a separate statement of material facts. Thus, the factual discussion is derived directly from the

22   parties' evidentiary submissions. Unsupported factual assertions made in the parties' briefs are

23   not repeated.

REPORT AND RECOMMENDATION - 2

1

<u>UNDISPUTED FACTS</u>

2

In 2008, Plaintiff was diagnosed with Type II Diabetes, requiring three doses of insulin

3 before each meal daily to regulate Plaintiff's blood sugar levels. Dkt. 44, Smith Dec., ¶ 3; Dkt.

4 45, Levin Dec., ¶ 6 (Plaintiff was treated with Lantus insulin and Humulin regular insulin).

5 Beginning in 2012, Plaintiff's A1c levels were elevated in the 8-11.5 range consistently. Dkt. 45,

6 Levin Dec., ¶ 7. According to Dr. Levin, the A1c is a blood test that is a very good indicator of

7 diabetes control. An A1c reflects the average glucose levels of the patient in the prior 3 months.

8 An A1c under 7 reflects good diabetes control. An A1c over 8, which Plaintiff had for years,

9 reflects poor control, with an increased risk of infections and poor tissue healing, especially

10 postoperatively. *Id.* In 2015, Plaintiff was diagnosed with diabetic neuropathy, a condition

11 caused by high blood sugar which can damage nerves throughout the body. This condition

12 causes Plaintiff to experience pain and numbness in his feet and legs. *Id.*, Smith Dec., ¶ 4.

13

On January 16, 2018, Plaintiff was seen by PA-C Robin Smith for lower back pain,

14 which radiated into his hips and legs. Defendant Smith attributed the pain to an ongoing foot

15 issue and diagnosed arthritis and scoliosis. Dkt. 44, Smith Dec., ¶ 7. Plaintiff complained of

16 excessive pain and discomfort to medical staff in the following months, during which time his

17 mobility steadily decreased. He was first issued a cane, then a wheeled walker with a seat.

18

On April 2, 2018, while receiving an injection of anti-inflammatory pain medication,

19 Plaintiff requested stronger pain management and a wheelchair, but nurses T. Hale, RN2 and W.

20 Geddes, RN denied his requests. That same day, Plaintiff filed a grievance over the lack of pain

21 medication and mobility aids. He filed additional grievances throughout April and May of 2018

22 as mobility aids were issued to him for short intervals and then rescinded. PA-C Robin Smith

23 told Michael Smith Plaintiff did not need an MRI and it was just arthritis. *Id.*, Smith Dec ¶ 8. On

1    April 25, 2018, Plaintiff was issued a health status report (HSR) limiting his standing time to 10

2    minutes and he was issued a cane. *Id.*, Smith Dec., ¶ 9.

3           Since October 2007, Plaintiff has taken Metformin to prevent high blood sugar episodes

4    and to regulate the way his metabolic system processes food, including blood sugar. Dkt. 44,

5    Smith Dec., ¶ 10. In April 2018, Plaintiff submitted several requests for a re-fill, but he stopped

6    receiving the medication Metformin on April 30, 2018. Plaintiff was informed Defendant Robin

7    Smith had allowed the prescription to expire. After Plaintiff filed a grievance, Defendant Robin

8    Smith renewed his prescription on May 3, 2018. Plaintiff did not receive the medication until at

9    least May 8, 2018, when he met with RN4 Debbie Gingeresky, who noted in Plaintiff's chart he

10   had complained about the lack of Metformin and "provider is aware of patient's clinical

11   concerns." *Id.*, Smith Dec., ¶ 11.

12          By May 14, 2018, Plaintiff's A1c levels had risen to 9.9, which is above the target range

13   for diabetic patients. Dkt. 44, Smith Dec., ¶ 12. According to Defendant Jo Ella Phillips, the A1c

14   for a normal, nondiabetic individual would be under 6.4 and anything over that requires

15   adjustments of medication and lifestyle to bring the A1c down. Dkt. 46, Ex. B, Phillips Dep. at

16   24:9-25. Although Plaintiff's A1c levels had risen to 9.9, few changes were made to Plaintiff's

17   medication, diet, and exercise and he was not referred to an endocrinologist or provided with

18   education by the DOC nutritionist. Dkt. 44, Smith Dec., ¶ 12; Dkt. 46, Ex. A, Curl Dep. at 83:6-

19   14. Plaintiff was also not on a diet to try to reduce his A1c, which is a significant factor in

20   bringing down A1c levels. Dkt. 46, Ex. B, Phillips Dep. at 26:1-4 and 27:4-7.

21          By June 20, 2018, Plaintiff was experiencing increasing leg pain, muscle spasms, and

22   feelings of weakness in his lower extremities. On June 22, 2018, Defendant Robin Smith

23   prescribed Ibuprofin and submitted a consultation request for physical therapy. Defendant Smith

noted Plaintiff's pain and weakness had been ongoing, was worsening, and Plaintiff was experiencing cramps in his thighs and calves. Then-Facility Medical Director Julia Barnett approved the consultation request that same day. Dkt. 44, Smith Dec., ¶ 15. On June 26, 2018, Plaintiff's x-ray revealed multi-level degenerative disc disease (osteoarthritis of the spine) including severe disc narrowing and multilevel spondylolisthesis. *Id.*, Smith Dec., ¶ 16. Medical staff did not alter Plaintiff's medication or form any treatment plan. *Id.*, Smith Dec., ¶ 17.

In early July 2018, Plaintiff repeatedly asked to see a physical therapist and the results of his June 26 x-ray. Plaintiff complained both in person at sick call, and in writing via Health Services Kite ("HSK") that he was experiencing pain, muscle atrophy, limited range of motion, and sudden, involuntary muscle contractions in his legs while walking. In an encounter report, medical staff described Plaintiff's pain as feeling like his "legs [were] on fire." Plaintiff repeatedly requested medication to help manage the pain. Plaintiff was told he would be scheduled to discuss x-ray results with his primary care provider and the physical therapy referral had been sent for scheduling. Dkt. 44, Smith Dec., ¶ 17. On July 17, 2018, another set of x-rays were taken showing evidence of multilevel degenerative disk disease and limited range of motion in Plaintiff's lower back. Dkt. 44, Smith Dec., ¶ 18.

On July 27, 2018, Plaintiff met with Bryan Weston, DOC's physical therapist. Mr. Weston noted deconditioning, muscle atrophy, limited range of motion, and decreased mobility. Dkt. 44, Smith Dec., ¶ 19. On August 2, 2018, Plaintiff filed a grievance over the continued lack of approval for a medical mattress given the degenerative disc disease revealed by the x-rays. Dkt. 44, Smith Dec., ¶ 20. DOC staff responded Plaintiff's condition did not meet the criteria for a medical mattress as outlined in the Offender Health Plan ("OHP"): DOC Protocol for Medical Devices. The same response noted, however, that per the OHP, "positioning devices and cervical

pillows" may be used for "musculoskeletal conditions." Plaintiff continued to appeal this grievance through November 2018 and pointed out he had been diagnosed with a musculoskeletal condition in the form of degenerative disc disease, which was causing him significant pain. DOC staff deemed the mattress request was not medically necessary although no consultation request had been submitted to the Facility Medical Director or the Care Review Committee ("CRC"). *Id.*, Smith Dec., ¶ 21.

In the fall of 2018, DOC medical staff again failed to renew Plaintiff's prescriptions after he made several attempts to request renewals of Ibuprofen and Etodolac, both pain medications used to manage his degenerative disc disease. Medical staff allowed those prescriptions to expire on September 23, 2018, and did not timely renew them, leaving Plaintiff without any pain management medication for weeks. Dkt. 44, Smith Dec., ¶ 22. On November 13, 2018, Plaintiff informed PA-C Adelaide Horne, his primary care provider at the time, that his main health concerns were the pain and mobility issues arising from his back and requested a referral to have an MRI for further diagnoses. Defendant Horne denied the request. In accordance with DOC policy, Plaintiff appealed this decision through the normal grievance process, filing the initial grievance on November 15, 2018. *Id.*, Smith Dec., ¶ 24.

On December 18, 2018, Plaintiff received Level 1 responses to two of his grievances regarding blood sugar drops due to timing issues with insulin and meals. In these responses, Brandi Blair and Elke Jackson indicated the policy for diabetic prisoners was to keep snacks on hand in their cells in case of delays caused by lockdown or recount. Plaintiff was told to buy snacks from commissary, he could take one extra item from breakfast to store in his cell, and that if neither of these were sufficient, he should ask his primary care provider for a prescription for glucose tabs. Plaintiff was issued a blood glucometer and told to declare a medical emergency if

his blood sugar dropped below 70 mg/dl. Plaintiff appealed these responses and tried to follow the advice, by taking an extra meal item from breakfast to store in his cell as an emergency snack and asking medical staff about a prescription for glucose tabs. Dkt. 44, Smith Dec., ¶26.

On December 21, 2018, Plaintiff was forced to dispose of the food he had stored in his cell on the advice of Blair and Jackson. Custody Officers Downy and Hamilton told Plaintiff if he did not dispose of the snacks, he would be denied one of his regular meals. Plaintiff filed a grievance over this incident and again asked medical staff about obtaining a prescription for glucose tabs. The request for glucose tabs was denied. Dkt. 44, Smith Dec., ¶ 27.

PA-C Adelaide Horne was Plaintiff's primary care provider at this time. She testified the DOC has a specially prepared diet for diabetic inmates, including those with Type 2 Diabetes. Receiving this diet requires an HSR prepared by a member of the medical staff. Dkt. 46, Deposition of Adelaide Horne ("Horne Dep."), Exhibit C to Parker Dec., at 29:17-30:8. As of March 5, 2019, no steps had been taken for Plaintiff to receive this special diet. *Id.*, Horne Dep. at 121:3-14. Defendant Horne stated any counseling Plaintiff on alterations of diet or exercise routines would be recorded in the patient's medical chart and, if it was not in Plaintiff's chart, she forgot to include it. *Id.*, Horne Dep. at 28: 6-29:14.

On March 22, 2019, Plaintiff's A1c was measured at 11.0%. Dkt. 44, Smith Dec., ¶ 32. From 2017 to 2019, Plaintiff's A1c, which was tested multiple times, ranged from 9-11.4%.

According to Dr. Levin, when the A1c is at the range of Plaintiff's, the AACE 2019 recommendation is to intensify treatment with triple therapy, including basal insulin and oral agents such as sglt-2 and glp-1. Dkt. 45, Levin Dec., ¶ 8. When the A1c is above 9, which Plaintiff's was most of the time in 2018 through 2020, AACE recommends intensifying the dual basal/bolus regimen every 2-3 days to reach an A1c under 7 and fasting bags under 110, within 3

months. AACE considers 3-6 months as an adequate time to intensify therapy and bring A1c down to a 7% range. *Id.* Despite these elevated levels of A1c, DOC staff made no significant changes to Plaintiff's treatment regime, did not refer him to an endocrinologist, prescribe diabetes medication, or provide Plaintiff with a diabetic diet. Dkt. 45, Levin Dec., ¶ 9. Defendant Horne testified she informed Plaintiff of the target A1c for his surgery, told him that he should reduce the number of carbohydrates he was eating, and "work with the nurses to adjust his insulin," but she did not write this in Plaintiff's chart. Dkt. 46, Ex. C, Horne Dep. at 136:2-11. Defendant Horne did not issue an HSR for Plaintiff to receive a diabetic diet. *Id.*, 36: 12-15.

From 2017-2019, Plaintiff's A1c was tested multiple times and was high, ranging from 9-11.4. Dkt. 45, Levin Dec., ¶ 9. Despite these very high A1c levels, indicating poor diabetes control, no significant changes were made in his treatment regimen. No endocrinologist consultation was obtained, and no diabetes medications were added. *Id.* Plaintiff's PA, Robin Smith, ordered and reviewed Plaintiff's A1c level four times during this period. In 2019, another PA, Adele Horne, began ordering A1c levels. Despite even higher levels over 11, she also took no action to improve Plaintiff's control that stayed suboptimal into 2020. Additionally, Plaintiff's NP, M. Keppler, continued to prescribe nearly identical insulin regimens in 2018-2020, despite Mr. Smith's poor diabetes control. *Id.*

On June 7, 2019, Plaintiff was seen by a neurosurgeon, Dr. Shiveindra B. Jeyamohan, MD at Evergreen Health. Dkt. 44, Smith Dec., ¶ 35. Dr. Jeyamohan proposed a two-day surgical procedure to address his spine issues. *Id.*, Smith Dec., ¶ 36. Following his appointment with Dr. Jeyamohan, Defendant Horne said she would present Plaintiff's case to the CRC for approval for surgery, a medical mattress, and stronger pain medications. *Id.*, Smith Dec., ¶ 37.

1    On June 19, 2019, the CRC approved Plaintiff's surgery but denied the request for a

2    medical mattress and the following week, denied the request for stronger pain medication. That

3    same day, Plaintiff's A1c was measured at 11.4%, but DOC medical staff did not modify his

4    treatment or refer him to a diabetes care specialist. Dkt. 44, Smith Dec., ¶ 38. On June 25, 2019,

5    Defendant Horne issued an HSR (effective through December 25, 2019), which provided

6    Plaintiff with a full-time therapy aide to assist with daily life activities while he was awaiting

7    surgery. *Id.*, Smith Dec., ¶ 39.

8         On July 15, 2019, Plaintiff was informed through a response to one of his grievances that

9    his surgery had been scheduled. On July 29, 2019, Defendant Horne told Plaintiff his

10   neurosurgeon postponed his surgery for six to twelve months because Plaintiff's blood sugar was

11   not adequately controlled and his A1c needed to be lower. *Id.*, Smith Dec., ¶ 40. DOC medical

12   staff did not prescribe or discuss steroid injections as an interim treatment option to manage

13   Plaintiff's pain while he awaited surgery. The lack of adequate pain management prevented

14   Plaintiff from engaging in regular exercise as indicated to better manage his diabetes in

15   preparation for surgery. *Id.*, Smith Dec., ¶ 41.

16        In Dr. Levin's opinion, the treatment of Plaintiff by DOC prison medical staff and

17   specifically, the medical care provided by Adelaide Horne NP, M. Keppler, and Robin Smith,

18   fell below the standard of care because they failed to take appropriate action to control Plaintiff's

19   diabetes. Dr. Levin opines this failure caused Plaintiff to experience physical harm to his general

20   health, increased his risk of infection, and was the primary cause of the delay of his medically

21   necessary back surgery. Dkt. 45, Levin Dec., ¶ 4. Moreover, and despite the clear guidelines

22   from major endocrinology organizations on how to rapidly improve diabetes control with an A1c

23   under 8%, Plaintiff's attending PAs Robin Smith and Adelaide Horne, along with NP M.

Keppler, failed to adopt adequate measures, such as a varied insulin regime, an endocrinologist consultation, or provide Plaintiff with a certified diabetes educator and nutritionist. Dkt. 45, Levin Dec., ¶ 6.[1]

On August 19, 2019, the CRC denied Plaintiff's requests for further nerve-testing for possible treatments for his symptoms. The CRC stated the tests were unnecessary because Plaintiff was already approved for surgery. The CRC approved prescribed muscle relaxers and anticonvulsants. Dkt. 44, Smith Dec., ¶ 43. In late August 2019, after a hypoglycemic episode where Plaintiff's blood sugar dropped to 49 mg/dl, Plaintiff finally received a prescription for glucose tabs he had been requesting since late 2018. *Id.*, Smith Dec., ¶ 44.

In September 2019, Plaintiff was transferred from the Monroe Correctional Complex ("MCC") to Airway Heights Corrections Center ("AHCC"). On several occasions, Plaintiff received carbohydrate meal trays (provided to manage blood sugar levels) with preparation dates in 2017. Plaintiff's request for fresher food was denied but the DOC disposed of its entire stock of meal trays with 2017 preparation dates shortly after Plaintiff filed a grievance on October 2, 2019. Dkt. 44, Smith Dec., ¶ 45. On November 5, 2019, Plaintiff's A1c was measured at 9.2%. *Id.*, Smith Dec., ¶ 47.

On November 16, 2019, Corrections Officer Tim White told Plaintiff the therapy aide granted through the HSR issued by Defendant Horne had been revoked, although the HSR did not expire until December 25, 2019. Dkt. 44, Smith Decl., ¶ 48. By that time, Plaintiff was using

---

[1] Dr. Levin agrees that surgical risks (*i.e.*, infection, abscesses, retinopathy, renal failure) due to high A1c levels is a legitimate concern for postponing Plaintiff's surgery as it is well established medically that Plaintiff would have been at higher risk due to his poorly controlled diabetes (and in fact, Plaintiff did suffer a surgical infection and abscess postoperatively). Dkt. 45, Levin Dec., ¶ 12. Dr. Levin attributes this poor diabetes control to Defendants' failure to respond to Plaintiff's high glucose and A1c levels over the years. *Id.*, ¶ 14.

a wheelchair to move through DOC facilities and his assigned therapy aide pushed his chair to help him avoid back strain and pain while he awaited surgery. After his interaction with Defendant White, Plaintiff was given a copy of a new HSR, which appeared to have been issued by Deborah Tonhofer on November 6, 2019. This HSR specifically noted Plaintiff was not to have others push his wheelchair and he should use a walker instead. Plaintiff had not met with Defendant Tonhofer prior to November 6th and was given no explanation for the new restriction. Plaintiff filed a grievance on this issue on November 16, 2019. *Id.*

On November 20, 2019, Defendant White demanded Plaintiff leave his wheelchair and when Plaintiff refused, Defendant White physically pulled Plaintiff out of his wheelchair and onto the ground. Defendant White put his weight on Plaintiff's lower body, causing Plaintiff extreme pain due to his spinal condition. Immediately thereafter, Plaintiff began to experience a sharp increase in symptoms including increased numbness in his lower extremities and urinary incontinence severe enough to require the use of a catheter. Dkt. 44, Smith Dec., ¶ 49. Despite the progression of his symptoms and his loss of urinary continence, Plaintiff was not taken to see his neurosurgeon for follow-up. *Id.*, Smith Dec., ¶ 50.

In early December 2019, DOC transferred Plaintiff to Washington State Penitentiary ("WSP"). During intake, Plaintiff was forbidden from using his wheelchair and was forced to walk. Intake staff told Plaintiff this was because Plaintiff had assaulted a corrections officer at AHCC. Plaintiff filed a grievance concerning this treatment and intake staff's refusal of timely access to a toilet, meals, or his diabetes medication. Dkt. 44, Smith Dec., ¶ 51.

On December 6, 2019, Plaintiff noticed he had not received his long-acting insulin during his morning insulin injection. Plaintiff immediately filed an emergency grievance. In response, PAC Jennifer Meyers told him his medications would be reviewed by a provider. Dkt. 44, Smith

1    Dec., ¶ 52. At some time in December 2019, a physician's assistant told Plaintiff he would not be

2    scheduled for another consult with his neurosurgeon while awaiting surgery until his target A1c

3    was below 8.0%, even though his symptoms were worsening in ways his neurosurgeon had

4    asked to be immediately informed of, *i.e.*, the onset of urinary incontinence and worsening

5    numbness. *Id.*, Smith Dec., ¶ 53.

6            Throughout December 2019 and January 2020, Plaintiff continued to pursue grievances

7    concerning insufficient care for his spine conditions and lack of adequate management of his

8    diabetes. Plaintiff also made several attempts to be permitted to wear his specialty orthotic

9    footwear through in-person conversation and sending kites to his healthcare providers and the

10   broader health services team. Plaintiff was repeatedly told this was not allowed in the Intensive

11   Management Unit ("IMU") where he was housed. The denial of the orthotics Plaintiff typically

12   utilized per the advice of his podiatrists, worsened his pain, and made it more difficult to move

13   about or exercise. Dkt. 44, Smith Dec., ¶ 54.

14           On January 24, 2020, Plaintiff received the Level II response to his grievance concerning

15   his intake to WSP. DOC staff wrote, "the fact is, you can ambulate, and were asked to do so."

16   Dkt. 44, Smith Dec., ¶ 55. On January 28, 2020, Plaintiff's A1c was measured; and he sent a kite

17   to his health care team asking about his latest A1c and why it was taking so long to get his

18   diabetes under control for surgery. PA-C Jennifer Meyers responded the next day stating they

19   were awaiting his A1c results and that his surgery was delayed because of his high A1c. *Id.*,

20   Smith Dec., ¶ 56. On February 4, 2020, Plaintiff received a reverse health services kite from

21   Defendant Meyers stating his January 28th A1c result was 8.1%, the goal was to be below 7.0%,

22   and Plaintiff's A1c would be retested in three months. *Id.*, Smith Dec., ¶ 57.

23

On February 11, 2020, Plaintiff sent a health services kite to the Facility Medical Director Dr. F. John Smith regarding the delay in his surgery. Dr. F. John Smith responded to his kite on February 19, 2020, reiterating Plaintiff would be scheduled for follow-up with neurosurgery once his A1c was below 8.0%. That same day, Plaintiff filed a grievance concerning the delays in his surgery. Dkt. 44, Smith Dec., ¶ 58. On February 24, 2020, Plaintiff's A1c was measured at 7.7%, qualifying him for surgery. *Id.*, Smith Dec., ¶ 60.

On March 2, 2020, Plaintiff was transported to Providence's Kadlec Neurosurgery Center and evaluated by Aron Steward, ARNP. Steward recommended Plaintiff be referred to a pain management specialist to discuss epidural steroid injections. Dkt. 44, Smith Dec., ¶ 63. On March 9, 2020, Plaintiff sent a medical services kite asking to be seen in follow-up to his neurosurgery appointment a week prior to discuss a concrete treatment plan. In response, Plaintiff was seen again by PA-C Jo Phillips on March 11, 2020. Defendant Phillips told Plaintiff he would be referred to pain management, but DOC did not issue HSRs for medical mattresses. *Id.*, Smith Dec., ¶ 65.

Throughout March and April 2020, Plaintiff continued to ask about his referral to pain management and access to steroid injections. Medical staff repeatedly refused to engage with him or address his concerns on this topic. Plaintiff was also unable to access the specialty footwear required (as indicated by his podiatrist) to manage his pain and prevent the growth of calluses on his feet and other diabetes-related complications. Plaintiff sent multiple kites to his medical team and to Health Services Manager K. Forss. *Id.*, Smith Dec., ¶ 66. On May 7, 2020, Plaintiff sent another kite inquiring after the delay in his surgery. The next day, medical staff responded that, due to COVID-19 protocols, no appointments with outside medical providers could be made. *Id.*, Smith Dec., ¶ 67.

On May 15, 2020, Plaintiff returned to Kadlec Neuroscience Center and was seen by Dr. Andrew Bieber, DO, a board-certified osteopathic neurosurgeon, to discuss pain management options. Dkt. 44, Smith Dec., ¶ 68. Dr. Bieber documented Plaintiff had lost about half the strength in his foot, especially on the left side. Dr. Bieber expressed concern with Plaintiff's status, stating "muscle wasting and being in a wheelchair is something that scares neurosurgeons" and "unfortunately it's very difficult, because then you have to play catch-up and solve these severe problems." Dkt. 46, Deposition of Andrew Bieber ("Bieber Dep."), Exhibit D to Parker Dec., at 23:3-16.

On July 6, 2020, Plaintiff followed up with Dr. Bieber at Kadlec regarding his pain management and surgery preparations. Dkt. 44, Smith Dec., ¶ 70. On August 17, 2020, a Providence provider ordered an MRI of Plaintiff's spine for surgical planning and further diagnostic purposes. *Id*., Smith Dec., ¶71.

On September 24, 2020, Plaintiff again met with Dr. Bieber, this time to review his MRI and discuss a surgical plan and prognosis. Dkt. 44, Smith Dec., ¶ 72. In his September 24, 2020, note, Dr. Bieber found Plaintiff had "profound lower extremity dysfunction with severe neurological injury and precipitous neurological decline." Dkt. 45, Levin Dec., ¶ 11. Dr. Bieber noted Plaintiff "requires urgent, rapid surgical intervention due to profound severe neurological deficits along with neuropathy syndrome." Dkt. 46, Ex. D, Bieber Dep. at 10:12-20. Dr. Bieber diagnosed *cauda equina* – "those words for a surgeon are like saying this patient's on fire. We need to operate and put it out." *Id.* Dr. Bieber also testified he was surprised at how long it was until Plaintiff was finally brought in for surgery "because [he] presented with such severe pain" and had "lost about half the strength in his foot, especially on his left side." *Id.*, 23:3-23:16.

On November 3, 2020, Dr. Bieber performed surgery on Plaintiff – a lumbar laminectomy, medial facetectomies, foraminotomies and microdiscectomies at lumbar one to sacral one, and a bilateral decompression. On November 6, 2020, Plaintiff was discharged from the hospital and returned to DOC care. Dkt. 44, Smith Dec., ¶ 75. Both before and after his surgery, Plaintiff was placed in an unsanitary cell (feces on the outside of the toilet; hair, spit and toothpaste around the cell, scum on the floor). Dkt. 44, Smith Dec., ¶¶ 73, 76. Nurse Trener pulled a large ball of hair from the drain and told him the cell would be cleaned the next day, but he would need to remain in the room overnight while awaiting transport to the hospital. *Id.*, ¶ 73.

On his return to IMU, Plaintiff noticed fluid leaking from his back. A nurse (Alejandra) expressed concern that this was not normal for his stage of post-op healing. Plaintiff was provided with bandages, but the fluid continued to leak through. Dkt. 44, Smith Dec., ¶ 77. This fluid leakage persisted untreated until November 25, 2020, when Plaintiff registered a high fever and was transported to the emergency room at Providence St. Mary Medical Center. Plaintiff was given an MRI and informed he needed surgery due to an infection of his surgical site. Plaintiff was transported by ambulance to Kadlec Medical Center on November 26, 2020, where his back was reopened, and the infected site flushed out. At Kadlec, Plaintiff was diagnosed with an infection. A PICC line was installed to deliver intravenous antibiotics directly to his heart, and he was ordered to remain on these IV antibiotics for at least eight weeks. Dkt. 44, Smith Dec., ¶ 78.

On November 30, 2020, Plaintiff was discharged from Kadlec and returned to the hospital portion of WSP, where he remained bedridden and on IV antibiotics through mid-February 2021, when he was transferred to Stafford Creek Corrections Center ("SCCC"). Plaintiff received no physical therapy at WSP. *Id.*, Smith Dec., ¶ 79.

1

PLAINTIFF'S MOTION TO STRIKE (Dkt. 48)

2

Defendants make numerous factual assertions relating to Plaintiff's conduct, *i.e.*, Plaintiff

3

"actively thwarted" his medical provider's recommendations (Dkt. 40 at 13; 51 at 4); it was

4

Plaintiffs "own noncompliance with diet and exercise [that] likely played a very significant role

5

in the failure to control his diabetes and A1C levels" (Dkt. 51 at 3); "there is ample testimony

6

and records demonstrating that Mr. Smith's own actions likely significantly contributed to the

7

lack of control of his diabetes and A1C levels" (*id.*). Defendants provide no evidence or citation

8

to support any of these assertions. Defendants also argue that medical personnel regularly

9

adjusted Plaintiff's medication to control his diabetes but provide no testimonial or documentary

10

evidence that this occurred. Defendants provide no expert testimony to support their claim that

11

their treatment of Plaintiff's diabetic condition was within the standard of care.

12

Rule 56(a) of the Federal Rules of Civil Procedure requires that motions for summary

13

judgment be supported by evidence that can be admissible at trial. Defendants' commentary and

14

arguments about Plaintiff or what Plaintiff did or did not do, are inadmissible hearsay without

15

foundation or evidentiary support. Defendants provide no evidence to support these assertions.

16

*See Flaherty v. Warehousemen, Garage & Serv. Station Emp. Local Union No. 334*, 574 F.2d

17

484, 486 n.2 (9th Cir. 1978) ("Legal memoranda and oral argument, in the summary judgment

18

context, are not evidence, and do not create issues of fact capable of defeating an otherwise valid

19

motion for summary judgment."); *Goehring v. Wright*, 858 F. Supp. 989, 993 n.4 (N.D. Cal.

20

1994) ("It is axiomatic that the arguments of counsel are not evidence.").

21

Defendants also refers to "ample testimony and records" but provides no adequate

22

reference. *See Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir.

23

2001) ("The district court need not examine the entire file for evidence establishing a genuine

1    issue of fact, where the evidence is not set forth in the opposing papers with adequate references

2    so that it could be conveniently found.). The Court strikes all of Defendants' unsupported factual

3    references to Plaintiff and has not considered the unsupported references in its analysis.

4            Plaintiff also moves to strike the notes of the unidentified author (or authors) which were

5    read into the record by Dr. Maryann Curl during her deposition. Because it is not clear from what

6    Dr. Curl was reading or to know the source or accuracy of the notes, the Court grants the motion

7    to strike and has not considered the unsupported references in its analysis.

8            Plaintiff also moves to strike the "Behavioral Observation" notes attached to Dr. Curl's

9    deposition because they are unauthenticated and "add nothing to the negligence analysis."

10    Defendants attached these notes in support of their argument that Plaintiff's behavioral records

11    alone speak volumes to "his ability to physically interact with other confined residents, assault

12    them, assault staff, and verbally abuse everyone." Dkt. 47 at 4. The Court denies Plaintiff's

13    motion to strike these notes as they are presumably contained in Plaintiff's record and can be

14    authenticated by Defendants prior to trial. The relevance of these notes to the issues presented is

15    addressed in the Court's analysis of the parties' motions.

16                                  SUMMARY JUDGMENT STANDARD

17            Summary judgment is proper if "the movant shows that there is no genuine dispute as

18    to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

19    P. 56(a). The moving party must initially demonstrate the absence of any genuine issue of

20    material fact for trial, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), after which the

21    burden shifts to the opposing party to identify specific material facts that are genuinely disputed,

22    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

23

1     Courts assessing a summary judgment motion view the facts and draw reasonable

2  inferences in favor of the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). A factual

3  dispute must be genuine and not "blatantly contradicted by the record, so that no reasonable jury

4  could believe it." *Id*. at 380. Mere assertions in legal papers cannot create a genuine dispute. *S.A.*

5  *Empresa de Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d

6  1235, 1238 (9th Cir. 1982). There must be evidence on which the jury could reasonably rely to

7  find for the non-movant. *Liberty Lobby*, 477 U.S. at 252.

8     When ruling on simultaneous cross-motions for summary judgment on the same claim,

9  the court must consider evidentiary material identified and submitted in support of both motions

10  and in opposition to both motions before ruling on each. *Tulalip Tribes of Wash. v. Washington*,

11  783 F.3d 1151, 1156 (9th Cir. 2015) (quoting *Fair Housing Council of Riverside Count., Inc. v.*

12  *Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

13                       <u>DISCUSSION</u>

14  A.    <u>Eighth Amendment Deliberate Indifference – Count I</u>

15     Defendants move for dismissal of Plaintiff's Eighth Amendment deliberate indifference

16  claim asserted against Defendants Robin Smith, Julia Barnett, Jack Warner, Adelaide Horne,

17  Elke Jackson, Areig Awad, Cory Pruitt, Deborah Tonhofer, Tim White, Jon Reyes, Kenny

18  Hawkins, Carleen Grimes, Dwayne Evans, Jennifer Meyers, Jo Phillips, F. John Smith

19  (deceased), and Trina Ralston. Dkt. 1-2 at 2-4.

20     Deliberate indifference to a prisoner's serious medical needs amounts to the cruel and

21  unusual punishment prohibited by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104

22  (1976). A prison official violates the Eighth Amendment only when: (1) the deprivation alleged

23  is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to

1    the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Evaluating a

2    claim of deliberate indifference requires an examination of "the seriousness of the prisoner's

3    medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974

4    F.2d 1050, 1059 (9th Cir.1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*,

5    104 F.3d 1133, 1136 (9th Cir.1997) (en banc).

6          "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in

7    further significant injury or the 'unnecessary and wanton infliction of pain.'" *Id*. (quoting *Estelle*,

8    429 U.S. at 104). A prison official exhibits deliberate indifference when he or she knows of and

9    disregards a substantial risk of serious harm to inmate health. *See Farmer*, 511 U.S. at 837.

10   Plaintiff's uncontrolled type II diabetes and his lumbar disc herniation with radiculopathy,

11   lumbar stenosis of neurogenic claudication, lumbar facet arthropathy, degenerative disc disease,

12   progressive neurologic deficit, weakness of the lower extremities, lumbar myelopathy, and cauda

13   equina compression spinal stenosis qualify as serious medical conditions. Defendants make no

14   assertion to the contrary.

15         Thus, Plaintiff must show deliberate indifference by defendants – if prison officials "were

16   (a) subjectively aware of Plaintiff's serious medical need and (b) failed to adequately respond",

17   they were deliberately indifferent. *Rosati v. Igbinoso*, 791 F.3d 1037, 1039 (9th Cir. 2015).

18         Dr. Levin, who has 35 years' experience in clinically treating diabetic patients, opined the

19   DOC prison medical staff's treatment of Plaintiff was medically unacceptable, specifically the

20   medical care provided by Adelaide Horne, M. Keppler, and Robin Smith. Dkt. 45, Levin Dec., ¶

21   4. According to Dr. Levin, these medical care providers violated the standard of care because

22   they failed to control Plaintiff's diabetes. That failure caused Plaintiff to suffer physical harm to

23   his general health, increased his risk of infection, and was the primary reason Plaintiff's

REPORT AND RECOMMENDATION - 19

medically necessary back surgery being delayed for more than a year and a half. *Id.* Although Plaintiff's A1c levels were consistently well above the recommended levels and despite clear guidelines from major endocrinology organizations on how to rapidly improve diabetes control to achieve good control with an A1c under 8%, these healthcare providers failed to take steps to adequately control Plaintiff's blood sugar or to reduce his A1c. They failed to consult an endocrinologist or prescribe additional diabetes medication despite his consistently high levels of A1c. During 2017 to 2019, PA Robin Smith ordered and reviewed Smith's A1c levels four times. In 2019, Adelaide Horne began ordering A1c levels and, despite high levels over 11, she also took no action to improve Smith's control that stayed suboptimal into 2020. NP M. Keppler continued to prescribe Smith nearly identical insulin regimes in 2018-2020 despite Plaintiff's poor diabetes control. Levin Dec., ¶ 9. Dr. Levin opines that these providers, individually and collectively, failed to bring Plaintiff's blood sugar levels under control or to bring down his dangerously high A1c for several years while his health deteriorated and his ability to have pain-relieving surgery was delayed. *Id.* Defendants do not dispute this evidence.

According to Plaintiff's sworn testimony, Defendant Robin Smith disregarded Plaintiff's complaints of lower back pain despite multiple grievances as his mobility worsened to the point of needing a cane and wheeled walker. *Id.*, ¶¶ 8-9. Plaintiff grieved the lack of appropriate medication and mobility aids and requested an MRI but Defendant Robin Smith disregarded Plaintiff's complaints and denied his request for an MRI. *Id.* Also, in April 2018, Defendant Robin Smith failed to refill Plaintiff's diabetes medication although she knew the medication was about to expire, Plaintiff had made several requests to refill the medication, and the medication was necessary to treat Plaintiff's severe case of diabetes. *Id.*, ¶ 12. And, although Defendant Robin Smith knew Plaintiff's was experiencing increasing leg pain, muscle spasms,

cramping in his thighs and calves, and weakness in his lower extremities (*id*., ¶ 16) and knew

that Plaintiff's x-ray showed advanced multilevel degenerative disc disease, she did not alter his

pain medication, provide a treatment plan, or refer Plaintiff to a neurosurgeon or spine specialist.

*Id*., ¶ 18.

Also, according to Plaintiff's sworn testimony, Defendant Horne was aware of Plaintiff's

diabetic conditions, multi-level degenerative disc disease, and worsening mobility but she denied

Plaintiff's requests for an MRI for further diagnosis and treatment. *Id*., ¶ 25. After filing

grievances to this decision, the MRI was taken on February 27, 2019, but Defendant Horne failed

to contact Plaintiff with the results for nearly a month and only then, after Plaintiff filed a

grievance. *Id*., ¶¶ 32-33. Although she was aware that Plaintiff's surgery would be delayed for

six to twelve months because his A1c was at dangerously high levels, Defendant Horne did not

discuss interim treatment options with Plaintiff. *Id*., ¶ 42. Defendant Horne was also aware of

Plaintiff's extreme pain and emotional anguish, but she failed to provide him with pain relief or a

treatment plan to bring down his A1c levels, which were preventing his much-needed surgery.

*Id*., ¶ 43. Defendant Horne testified she did not consult the AACE, or any other organization, in

treating Plaintiff's diabetes. Dkt. 46, Ex. C, Horne Dep. at 51:10-19. Defendant Horne was also

aware of an existing diet given to inmates suffering from Type II diabetes and the steps required

to implement this diet, but she did not issue an HSR for Plaintiff to receive the diet. Defendant

Horne was instructed in PA school on the proper protocol for recording any counseling for

diabetic patients in medical charts, yet stated that, if something was not written down in a chart,

it was because she would merely forget. Dkt. 46, Horne Dep., Ex. B to Parker Dec., at 28:6-

29:16.

1      Defendants do not dispute any of the foregoing evidence. Defendants argue this claim

2  fails because Plaintiff's neurological surgeon could not say, with medical certainty, that the delay

3  in his back surgery caused him harm. What the surgeon said, however, is that …" the damage

4  was there. It needed to be addressed. And the longer the delay, the more damage that can occur."

5  Dkt. 46, Ex. A at 29:23--30:3-5. Dr. Bieber also testified that when he evaluated Plaintiff in

6  September 2020, Plaintiff had "profound neurologic deficits, which have been going on for three

7  years. Profound lower extremity dysfunction . . . "shooting pains" covering "many different

8  nerve regions consistent that this patient had narrowing or compression, not just one area." Dkt.

9  49, Parker Decl., Ex. A, Bieber Dep. 9:1-18. Dr. Bieber set a diagnosis of cauda equina at the

10  time he evaluated Plaintiff, one that requires "urgent, rapid surgical intervention due to profound

11  severe neurologic deficits along with neuropathy syndrome." *Id.* at 10:12-15:3. Dr. Bieber also

12  testified that performing surgery when a patient's A1c is above 8 almost guarantees that the

13  patient will get an infection and that it can be both dangerous and reckless to operate under those

14  circumstances. *Id.*, Bieber Dep. at 13:7-16:9.

15      Plaintiff's Eighth Amendment claim is based on Defendants' failure to provide him with

16  proper medical care for his diabetes, which delayed his needed surgery, caused him pain and

17  suffering, contributed to his worsening neurologic condition, and increased his risk of

18  postoperative infection. A failure to act can be enough to establish causation and 'a prison

19  official may be held liable under the Eighth Amendment if he knows that inmates face a

20  substantial risk of serious harm and disregards that risk by failing to take reasonable measures to

21  abate it.'" *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016) (quoting *Clem*

22  *v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (ellipsis omitted) (emphasis in original).

23

REPORT AND RECOMMENDATION - 22

Based on the summary judgment evidence, the Court concludes Plaintiff has raised material questions of fact as to whether Defendants Robin Smith and Adelaide Horne knew of and were deliberately indifferent to Plaintiff's serious medical needs – in particular, the medical need to provide treatment to Plaintiff to bring his diabetes under control. Defendants Smith and Horne knew Plaintiff's diabetes was not being adequately controlled and he was living in pain. They were aware Plaintiff was filing grievances regarding the lack of care and knew Plaintiff could not have his medically necessary surgery until his blood sugar was under control. A reasonable juror could conclude Robin Smith and Adelaide Horne were aware of the serious medical risk to Plaintiff's health and the affect his high A1c levels were having on his ability to have necessary back surgery but failed to take reasonable measures to abate it.

The Court recommends Defendants' motion for summary judgment on Plaintiff's Eighth Amendment claim as to Defendants Robin Smith and Adelaide Horne be denied as Plaintiff has raised questions of material fact as to whether these defendants were deliberately indifferent to his serious medical needs.

Plaintiff has provided no evidence to show the remaining individual defendants acted with deliberate indifference to his medical needs. As to Defendant Jo Phillips, Plaintiff avers she was aware of his condition and discussed his diabetes management and leg sores, but when he sent her a kite the next day expressing his extreme pain, she merely replied "noted." Plaintiff also contends Defendant Phillips failed to refer his request for a medical mattress to the CRC (even though his neurosurgeon had previously presented Plaintiff's case for a medical mattress to the CRC). These facts, even when viewed in the light most favorable to Plaintiff, do not raise an issue of material fact as to whether Defendant Phillips was deliberately indifferent to Plaintiff's serious medical needs by providing inadequate medical care.

1   Therefore, the Court recommends Defendants' motion for summary judgment be granted

2   as to Defendants Julia Barnett, Jack Warner, Elke Jackson, Areig Awad, Cory Pruitt, Deborah

3   Tonhofer, Tim White, Jon Reyes, Kenny Hawkins, Carleen Grimes, Dwayne Evans, Jennifer

4   Meyers, F. John Smith (deceased), Trina Ralston, and Jo Phillips.

5   B.    First Amendment Retaliation – Count II

6   Plaintiff claims Defendants Cory Pruitt, Tim White, Deborah Tonhofer, Carleen Grimes,

7   Dwayne Evans and Kenny Hawkins retaliated against him after he exercised his protected right

8   to file grievances against them. Dkt. 1-2 at 32-33

9   Prisoners have a First Amendment right to file grievances against prison officials and to

10  be free from retaliation for doing so. *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir.2009). A

11  retaliation claim has five elements. *Id*. First, the plaintiff must allege that the retaliated-against

12  conduct is protected. The filing of an inmate grievance is protected conduct. *Rhodes v. Robinson*,

13  408 F.3d 559, 568 (9th Cir.2005). Second, the plaintiff must claim the defendant took adverse

14  action against the plaintiff. *Id*. at 567. The adverse action need not be an independent

15  constitutional violation. *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir.1995). "[T]he mere threat of

16  harm can be an adverse action...." *Brodheim*, 584 F.3d at 1270. Third, the plaintiff must allege a

17  causal connection between the adverse action and the protected conduct. Because direct evidence

18  of retaliatory intent rarely can be pleaded in a complaint, allegation of a chronology of events

19  from which retaliation can be inferred is sufficient to survive dismissal. *See Pratt*, 65 F.3d at 808

20  ("timing can properly be considered as circumstantial evidence of retaliatory intent"); *Murphy v.*

21  *Lane*, 833 F.2d 106, 108–09 (7th Cir.1987).

22  Fourth, the plaintiff must allege the "official's acts would chill or silence a person of

23  ordinary firmness from future First Amendment activities." *Robinson*, 408 F.3d at 568 (internal

REPORT AND RECOMMENDATION - 24

1    quotation marks and emphasis omitted). "[A] plaintiff who fails to allege a chilling effect may

2    still state a claim if he alleges he suffered some other harm," *Brodheim*, 584 F.3d at 1269, that is

3    "more than minimal," *Robinson*, 408 F.3d at 568 n.11. Fifth, the plaintiff must allege "that the

4    prison authorities' retaliatory action did not advance legitimate goals of the correctional

5    institution...." *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir.1985).

6          It is undisputed Plaintiff filed many grievances and complaints regarding his conditions,

7    symptoms, and the need for and failure to provide care for his conditions. Dkt. 50, Smith

8    Amended Dec., ¶ 5. Defendants argue Plaintiff can put forth no significant probative evidence to

9    support the merely conclusory allegations in his Complaint as Plaintiff has no evidence any state

10   actor took adverse action against him, and he can prove no harm. Dkt. 40 at 12.

11         1.    <u>Cory Pruitt</u>

12         Plaintiff avers Defendant Pruitt knew of Plaintiff's grievances and internal complaints of

13   the lack of appropriate pain management and knew Plaintiff suffered severe pain if he had to

14   stand for more than ten minutes. However, when Plaintiff reminded Defendant Pruitt of this in

15   the insulin medication line, Defendant Pruitt told Plaintiff to sit on the ground.

16         Plaintiff's declaration testimony is not disputed. However, Plaintiff has not shown

17   Defendant Pruitt's comment is connected to Plaintiff's grievances regarding his pain medication,

18   that the comment constitutes chilling conduct (*i.e.*, was a threat or that Defendant Pruitt was

19   forcing Plaintiff to sit on the ground), constituted an adverse action, or lacks a penological

20   justification. The Court recommends granting Defendants' motion for summary judgment on

21   Plaintiff's claim of retaliation against Defendant Pruitt.

22   //

23   //

REPORT AND RECOMMENDATION - 25

1        2.    <u>Deborah Tonhofer</u>

2        On June 25, 2019, Defendant Horne issued an HSR (until December 25, 2019), granting

3 Plaintiff a full-time therapy aid to assist him with daily activities while he was waiting for

4 surgery. Dkt. 50, ¶ 41. On November 16, 2019, Defendant White told Plaintiff the therapy aid

5 had been revoked. After this interaction and after Plaintiff complained about Defendant White,

6 Plaintiff was given a copy of a new HSR specifying he was not to have someone push his

7 wheelchair but should use a walker instead. Plaintiff alleges the new HSR was "supposedly"

8 issued by Defendant Tonhofer on November 6, 2019. *Id.*, ¶ 50. Plaintiff also states he had not

9 met with Defendant Tonhofer before November 6, 2019, when the HSR "was supposedly issued"

10 and was not given a reason for this new restriction. On November 16, 2019, Plaintiff filed a

11 grievance against Officer White for forbidding any inmate from pushing his wheelchair.

12        Although Plaintiff's statements are not in dispute, Plaintiff has failed to provide sufficient

13 evidence to support a finding that Defendant Tonhofer retaliated against Plaintiff *because*

14 Plaintiff complained about Defendant White. Plaintiff apparently believes Defendant Tonhofer

15 backdated the HSR but there is no evidence that she did so and no reasonable basis from which it

16 may be inferred she did so. There is also insufficient evidence to support a finding the HSR

17 issued by Defendant Tonhofer is connected to Plaintiff's grievances, constitutes chilling conduct,

18 constituted an adverse action, and lacks a penological justification. The Court recommends

19 Defendants' motion for summary judgment be granted as to Plaintiff's retaliation claim against

20 Defendant Tonhofer.

21        3.    <u>Tim White</u>

22        On November 16, 2019, Plaintiff filed a grievance after Defendant White forbade any

23 inmate from pushing his wheelchair. Dkt. 50, ¶ 50. On November 20, 2019, Defendant White

REPORT AND RECOMMENDATION - 26

demanded Plaintiff leave his wheelchair and when Plaintiff refused, Defendant White physically pulled Plaintiff out of the wheelchair on to the ground and put his bodyweight on Plaintiff's lower back causing Plaintiff extreme pain due to his spinal condition. *Id*. Defendants provide no evidence to the contrary.

Plaintiff avers Defendant White took adverse action (physically assaulted him), that the assault occurred four days after Plaintiff exercised his First Amendment rights by filing a grievance against Defendant White relating to the use of his wheelchair, and that the adverse action caused him physical harm. Through his testimony, which Defendants do not dispute, Plaintiff describes more than minimal harm, which implicitly shows a chilling effect on his First Amendment rights. It is also implicit that assaulting a prisoner serves no correctional interest. The Court recommends Defendants' motion for summary judgment be denied as to Plaintiff's claim against Defendant White as Plaintiff has shown a genuine issue for trial.

4.    Carleen Grimes and Dwayne Evans

Plaintiff avers Defendants Grimes and Evans prevented him from using his wheelchair and forced him to walk during his intake at WSP, despite being "aware of the considerable pain this would cause [him] given [his] condition," and denied him food, insulin, and access to a bathroom during intake. Dkt. 50, ¶ 53. Plaintiff also avers "intake staff" told him this treatment was because he had assaulted a corrections officer at AHHC. *Id.* Plaintiff filed a grievance over this treatment and intake staff's refusal to allow him timely access to a toilet, meals, or his diabetes medication.

Plaintiff does not allege Defendants Grimes and Evans retaliated against him for filing a grievance (the grievance he filed against them occurred after their alleged conduct). Plaintiff claims that through unidentified "intake staff," he learned Defendants Grimes and Evans knew

1   about his altercation with Defendant White. These conclusory allegations are insufficient to raise

2   a question of material fact as to whether Defendants Grimes and Evans took adverse action

3   against Plaintiff in retaliation because Plaintiff engaged in First Amendment activity. The Court

4   recommends granting Defendants' motion for summary judgment on Plaintiff's claim of

5   retaliation against Defendants Grimes and Evans.

6        5.    Kenny Hawkins

7        Plaintiff avers Defendant Hawkins denied him access to pain medication because he was

8   ten minutes late to the medication line. Plaintiff also avers Defendant Hawkins knew he had filed

9   grievances against DOC staff. Defendant Hawkins told Plaintiff to take Ibuprofen "despite

10  knowing that the ibuprophen available was insufficient to manage [Plaintiff]s pain medication."

11  Dkt. 50, ¶ 54.

12       The Court finds Plaintiff has failed to raise an issue of material fact as to whether

13  Defendant Hawkins retaliated against him because he "filed grievances against 'DOC' staff.

14  While withholding medication may constitute an adverse action (*See Tomel v. Hawaii*, 570 Fed.

15  Appx. 717, 719 (9th Cir. 2014), Plaintiff fails to show a causal connection between the filing of a

16  grievance and Defendant Hawkins' conduct nor has he alleged any chronological sequence that

17  permits a reasonable inference of retaliation.

18       The Court recommends that Defendants' motion for summary judgment as to Plaintiff's

19  claim of retaliation against Defendant Hawkins be granted.

20  C.   Negligence – Count III

21       Plaintiff asserts a "General Negligence" claim against all Defendants. Dkt. 1-2 at 33-35.

22  Plaintiff contends the individual DOC employees are liable for medical negligence, and the DOC

23

1  and State of Washington are liable for medical negligence (breach of duty to provide medical

2  care) and corporate negligence (failure to following DOC medical policies). Dkt. 43.

3      In their motion for summary judgment, Defendants refer only to Plaintiff's "common law

4  negligence and negligent infliction of emotional distress" claims. Dkt. 40. And, in their

5  opposition to Plaintiff's motion, Defendants address the medical and/or common law negligence

6  as to "DOC medical staff".

7          1.    Individual Defendants

8      Under Washington law, a negligence claim against a health care provider requires a

9  showing that: (1) the provider failed to exercise that degree of skill, care, and learning expected

10 of a reasonably prudent health care provider in the profession or the class to which he belongs, in

11 the State of Washington, acting in the same or similar circumstances; and (2) such failure was

12 the proximate cause of the injury complained of. *See* RCW 7.70.040.

13     The proximate cause of an injury is "a cause which in a natural and continuous sequence,

14 unbroken by a new, independent cause, produces the event, and without which that event would

15 not have occurred." *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 935 (1982). Washington

16 Courts have consistently held the issue of proximate cause is generally a question for the

17 jury. *Id*. However, proximate cause may be a question of law for the court "when the facts are

18 undisputed and the inferences therefrom are plain and incapable of reasonable doubt or

19 difference of opinion[.]" *Id*. (citations omitted).

20     "[I]n cases involving alleged medical negligence, if a reasonable person could infer, from

21 the facts, circumstances, and medical testimony, that a causal connection exists, the evidence is

22 sufficient to survive summary judgment." *Attwood v. Albertson's Food Ctrs., Inc*., 92 Wn. App.

23 326, 330-31 (1998). "[E]vidence establishing proximate cause must rise above speculation,

1   conjecture, or mere possibility." *Id.* at 331. "Thus, medical testimony must demonstrate that the

2   alleged negligence 'more likely than not' caused the later harmful condition leading to injury;

3   that the defendant's action 'might have,' 'could have,' or 'possibly did' cause the subsequent

4   condition is insufficient." *Id.* (quoting *Merriman v. Toothaker*, 9 Wn. App. 810, 814 (1973)); *see*

5   *also O'Donoghue v. Riggs*, 73 Wn.2d 814, 824 (1968) ("To remove the issue from the realm of

6   speculation, the medical testimony must at least be sufficiently definite to establish that the act

7   complained of 'probably' or 'more likely than not' caused the subsequent disability.")

8           As discussed in detail above (as to Plaintiff's Eighth Amendment claim), Plaintiff's

9   expert, Dr. Levin, opined that the treatment of Plaintiff's diabetes by the prison's medical staff

10  collectively fell below the standard of care for the providers and specifically the medical care

11  provided by Adelaide Horne NP, M. Keppler and Robin Smith. The medical treatment provided

12  to Plaintiff by these medical providers violated the standard of care as they failed to take

13  appropriate action to control Plaintiff's diabetes for several years, which caused him to suffer

14  physical harm to his general health, increased his risk of infection, and was the primary cause of

15  his medically necessary back surgery being delayed for more than a year and a half. Dkt. 45,

16  Levin Dec., ¶ 3.

17          Dr. Levin concludes Defendants' conduct was medically unacceptable. Defendants do not

18  dispute Plaintiff's evidence they failed to take medically acceptable steps to bring his A1c under

19  control so he could safely undergo corrective surgery to relieve much of his pain. Instead,

20  Defendants argue medical personnel regularly adjusted Plaintiff's medication and Plaintiff's own

21  non-compliance with diet and exercise likely played a role in the failure to control his diabetes

22  and A1C levels. However, Defendants provide no testimonial or documentary evidence to

23  support these arguments. Arguments made by counsel in motion practice is not evidence to be

REPORT AND RECOMMENDATION - 30

considered on a motion for summary judgment. *See Flaherty*, 574 F.2d at 486 n.2 ("Legal

memoranda and oral argument, in the summary judgment context, are not evidence, and do not

create issues of fact capable of defeating an otherwise valid motion for summary judgment.");

*Goehring*, 858 F. Supp. at 93 ("It is axiomatic that the arguments of counsel are not evidence.").

Defendants submit excerpts of the deposition Dr. Maryann W. Curl, who was asked by

Defendants to review Plaintiff's medical and commissary files. However, these excerpts are not

probative of whether Defendants were negligent in their care of Plaintiff. Dr. Curl's credentials

and the scope of her review are not known. During her deposition, Dr. Curl refers to various

"notes", some dating back as far as 2012 and while she identifies some specific dates, she merely

provides a summary of various notes regarding Plaintiff's diet, exercise, and commissary

purchases. It is not clear from either the deposition or the record what Dr. Curl was reading at her

deposition. The records are not attached to the deposition excerpt provided to the Court. There is

no explanation or evidence to indicate who wrote the notes, where and why the notes were made,

the full content and context of the notes, or the source or accuracy of the notes.

Defendants also submitted several "Offender Behavior Observation" forms of Plaintiff

from 2019 and 2020. Dkt. 47, Hornbrook Dec., Ex. B. Defendants argue these observation

reports show Plaintiff's ability to "physically interact with other confined residents, assault them,

assault staff, and verbally abuse everyone." Dkt. 47 at 4. However, this evidence is not probative

of whether Defendants were negligent in Plaintiff's medical care.

Defendants contend Plaintiff's negligence claims fail because he cannot prove his back

issues were made worse by the delay. For this contention, Defendants rely solely on a portion of

Dr. Bieber's deposition testimony:

1

2

    Q.    … Are you able to say that the delay caused him – I mean, obviously he was in pain, but are you able to say that that delay caused him any physical damage?

3

4

5

    A.    I do not think I have the ability to say positively one way or the other. I could say that, in general, for patients – if you're able to take the pressure off the nerves, you prevent more injury, but I can't assign more probable than not that one delay or any scenario caused more damage. Just that the damage was there. It needed to be addressed. And the longer the delay, the more damage that can occur.

6

7

Dkt. 41, 29:19-30:5. Dr. Bieber did not have comparison imaging when questioned as he only

8

had Plaintiff's most recent MRI. Dkt. 49, Parker Dec., Ex. A at 12:22-13:6. In addition, Dr.

9

Bieber's statement goes only to the extent of Plaintiff's injuries and damage, not the pain and

10

suffering he was forced to endure. Plaintiff has presented undisputed evidence he was harmed by

11

the lack of appropriate medical care for his diabetes and as a result, he suffered in pain until his

12

surgery became urgent. Defendants have provided no evidence to the contrary.

13

    Defendants point to Dr. Bieber's testimony that he would never have performed the two-

14

phase lumbar procedure as originally recommended by the neurosurgeon at Evergreen. Dkt. 40 at

15

14 (citing Dkt. 41, Ex. A, Bieber Dep. at 50:12 to 51:18. The significance of this testimony is

16

unclear however, as Dr. Bieber performed Plaintiff's surgery and the issue is whether

17

Defendants' failed to take medically acceptable steps to bring Plaintiff's A1c under control so he

18

could safely undergo that surgery.

19

    Dr. Bieber also testified to what he observed of Plaintiff when he evaluated him again in

20

September of 2020:

21

    Q. And what did you conclude in this case?

22

23

    A. Kind of all of the above. Unfortunately the patient -- when I evaluated that patient, again, September 24, 2020, he had profound neurologic deficits, which have been going on for three years. Profound lower extremity dysfunction, part of being wheelchair prior for months due to progressive lower extremity atrophy.

> Atrophy is loss of muscle due to malfunction either of the nerves or due to patient's pain or patient's choice to lay in bed and essentially lose muscle. And then shooting pains which covered many different nerve regions consistent that this patient had narrowing or compression, not just one area. Simplest analogy I can give for this is like a mechanic seeing a car coming in.· All four tires are flat. So it's not just, oh, it's a problem. It's a problem that exists across multiple areas and multiple spaces.

*Id.*, Bieber Dep. at 9:1-18.

> I do not think so in this scenario because I put the setting and the diagnosis of cauda equina at the time that I evaluated him. That is normally an urgent -- I think I documented patient requires urgent, rapid surgical intervention due to profound severe neurologic deficits along with neuropathy syndrome. And so those words for a surgeon are like saying this patient's on fire. We need to operate and put it out. So those -- I think he would have been classified -- I'd have to go into a very difficult area of our medical record, but he would be classified as an urgent case. What that means -- it normally means, in some insurance settings, that we can try and expedite the approval processes for surgery.

*Id.*, Bieber Dep at 10:12-15:3.

Dr. Bieber made it clear that performing surgery when a patient's A1c is above 8 almost guarantees that the patient will get an infection and that it can be both dangerous and reckless to operate under those circumstances. *Id.*, Bieber Dep. at 13:7-16:9.

Accordingly, the undersigned recommends the Court grant Plaintiff's motion for summary judgment (Dkt. 43) and deny Defendants' motion for summary judgment (Dkt. 40) *as to Defendants Horne and Smith[2] only*. Defendants' motion for summary judgment (Dkt. 40) as to Plaintiff's negligence claims against the remaining individual defendants should be granted as Plaintiff provided no evidence that any of these defendants failed to exercise that degree of skill, care, and learning expected of a reasonably prudent health care provider and that such failure was the proximate cause of his injury. *See* RCW 7.70.040.

---

[2] Dr. Levin also opines that NP M. Keppler violated the standard of care. N. Keppler is not a defendant in this action.

REPORT AND RECOMMENDATION - 33

1          2.          State of Washington and DOC

2          Plaintiff moves for summary judgment on his negligence claim against the State

3  Defendants for negligence. Dkt. 43 at 20-25. The State of Washington has a duty to provide

4  medical care for those whom it is punishing by incarceration. This duty is nondelegable and the

5  failure to meet that obligation can constitute negligence. *Pedroza v. Bryant*, 101 Wn.2d 226,

6  232-33, 677 P.2d 166 (1984). This duty arises because DOC is "in a superior position to monitor

7  and control" the performance of the health care providers working there. *Id*. at 231; *Shea v. City*

8  *of Spokane*, 17 Wn. App. 236, 241-42, 562 P.2d 264 (1977). DOC's own medical policies define

9  the standard of care for the operation of its onsite healthcare facilities. *Douglas v. Freeman*, 117

10  Wn.2d 242, 248 (1991); *Pedroza v. Bryant*, 101 Wn.2d at 233-234 (1984); *Osborn v. Public*

11  *Hosp. Dist. No. 1*, 80 Wn.2d 201, 204-05 (1972); *Ripley v. Lanzer*, 152 Wn. App. 296, 324

12  (2009) (the applicable standard of care for a hospital is that of an "average, competent health

13  care facility" in the same or similar circumstances, generally defined by the hospital's bylaws).

14  DOC is also required to exercise reasonable care to adopt policies and procedures. *Osborn*, 80

15  Wn.2d at 204-05. DOC's Health Plan provides that "[i]t is the responsibility of the patient's

16  primary care practitioner to evaluate the appropriateness and necessity of the recommendations

17  in light of the patient's overall health care while considering the WA DOC Health Plan, DOC

18  policy, and any other pertinent factor." Dkt. 46, Parker Dec., Ex. E.

19          As discussed in detail above, Plaintiff's summary judgment evidence shows DOC

20  medical providers failed to properly manage Plaintiff's diabetes although they had numerous

21  opportunities to do so over the course of almost ten years. There is no dispute Plaintiff suffered

22  from severe stenosis, was in severe pain, and his condition deteriorated while his A1c levels

23  consistently ranged from 9 to 11.4 and he waited for a non-elective surgery. *See, e.g.* Dkt. 46,

Case 3:21-cv-05636-TMC     Document 53     Filed 09/14/23     Page 35 of 40

Ex. D, Bieber Dep. at 12:12-20 ("patient requires urgent, rapid surgical intervention due to profound severe neurologic deficits along with neuropathy syndrome); *id.* at 10:7-8 (looking at Plaintiff's initial MRI, Dr. Bieber "would expect [Plaintiff] to have severe pain."); *id.* at 23:3-16, 31:3-33:10; 67-69 (August 2021 MRI shows severe stenosis to the point where Plaintiff's nerves were crushed; Plaintiff had lost 40% of sensation on his left side and on his left leg across multiple regions and had shooting pain from his nerves down his legs).

Dr. Levin opines Plaintiff's poor diabetes control is related to the failure of DOC to respond to his high glucose levels and A1c levels over the years. Dkt. 45, Levin Dec., ¶ 14. Plaintiff's neurological deterioration with the delays to his surgery made him wheelchair bound with muscle atrophy, bladder disorders and in recurrent pain. *Id.* Although DOC medical providers were aware of Plaintiff's high A1c levels, they failed to follow clear guidelines to rapidly improve his diabetes control to achieve good control with an A1c under 8%, *i.e.*, a varied insulin regimen, diabetic and nutrition education, and consult with an endocrinologist to improve glucose control. Dkt. 45, Levin Dec., ¶¶ 14-15. It is also undisputed that years of poor diabetes control increased Plaintiff's risk of developing postoperative infection following his surgery. By November 2020, Plaintiff's condition had become urgent and dire, and his back disease had deteriorated to such a degree, Dr. Bieber would have performed surgery regardless of Plaintiff's A1c level. Dr. Bieber opined that the longer the delay in treating Plaintiff's back, the more damage can occur. *Id.*, Bieber Dep. at 29:17-30:5.

DOC has a duty to "intervene in the treatment of its patients if there is obvious negligence." *Schoening v. Grays Harbor Community Hosp.*, 40 Wn. App. 331, 335, 698 P.2d 593, review denied, 104 Wn.2d 1008 (1985). Plaintiff has provided uncontroverted evidence of prison medical staff's negligent conduct from April 2016 to the present. The State Defendants

REPORT AND RECOMMENDATION - 35

1    have produced no admissible evidence to raise an issue of fact as to whether they are liable for

2    negligence. State Defendants rely on inadmissible argument that Plaintiff failed to comply with

3    diet and exercise, purchased high-carbohydrate foods from the commissary and insisted on being

4    removed from a low-carb diet. State Defendants provided no sworn affidavits or expert

5    testimony to support these claims. State Defendants have not submitted a declaration from any

6    expert or any of Plaintiff's treating physicians to contradict Plaintiff's evidence that State

7    Defendants' medical treatment of Plaintiff's diabetes fell below the standard of care.

8            The undersigned recommends granting Plaintiff's motion for negligence against the State

9    of Washington and DOC (Dkt. 43) and denying Defendants' motion for summary judgment

10   (Dkt. 40) as to Plaintiff's negligence claims.

11           3.    <u>Negligent Infliction of Emotional Distress – Count IV</u>

12           A negligent infliction of emotional distress claim requires duty, breach, proximate cause,

13   and injury. *Hunsley v. Giard*, 87 Wash.2d 424, 553 P.2d 1096, 1102 (1976). To recover under

14   this claim, Plaintiff also must show objective symptoms of emotional distress. *See Corrigal v.*

15   *Ball & Dodd Funeral Home, Inc.*, 89 Wash.2d 959, 577 P.2d 580, 582 (1978) (citing *Hunsley*,

16   553 P.2d at 1103).

17           Plaintiff did not move for summary judgment on this claim. Dkt. 43. Defendants contend

18   this claim should be dismissed as redundant and subsumed by Plaintiff's common law

19   negligence claim. Defendants make this conclusory statement in their introduction and in

20   Paragraph E (Dkt. 40 at 2, 13), but provide no legal or evidentiary basis for dismissing this

21   claim. Thus, the Court recommends Defendants' motion for summary judgment on this claim be

22   denied.

23   *//*

REPORT AND RECOMMENDATION - 36

1    D.    Medical Malpractice – RCW 18.71 – Count V

2            Plaintiff asserts a medical malpractice claim against Defendants Julia Barnett, Robin

3    Smith, Areig Awad, Adelaide Horne, Deborah Tonhofer, Jon Reyes, Jennifer Meyers, Jo Phillips

4    and F. John Smith. Dkt. 1-2 at 35-37. The essence of this claim appears to be that the named

5    defendants were practicing outside the scope of their training in rendering treatment to Plaintiff

6    in violations of the standards set forth in RCW 18.71, *et. seq.*

7            Defendants briefly mention this claim in their introduction ("6. Plaintiff's claim for

8    medical malpractice fails as a matter of law where Plaintiff is unable to establish essential

9    elements of his claim"). However, the parties do not address or brief this claim in their motions.

10   As there is no motion before the Court, the undersigned does not address Count V.

11   E.    Failure to Supervise – Count VI

12           Plaintiff asserts his failure to supervise claim against Plaintiffs Julia Barnett, Areig Awad,

13   Deborah Tonhofer, F. John Smith, and the State of Washington.[3] Dkt. 1-2 at 37-38. Defendants

14   move for summary judgment on Plaintiff's supervisory claim based on the absence of evidence.

15           Generally, supervisors are not vicariously liable for constitutional violations under §

16   1983. *Peralta v. Dillard*, 744 F.3d 1076, 1085 (9th Cir. 2013). A supervisor may be found liable

17   under § 1983 "if there exists either (1) his or her personal involvement in the constitutional

18   deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and

19   the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen

20   v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). As to the latter, the plaintiff proves a causal

21   connection between the supervisor's wrongful conduct and the alleged constitutional violation by

22

23
_____
[3] Plaintiff also asserts this claim against "Does II through X"; however, at this time, no Doe
Defendants have been identified or served.

REPORT AND RECOMMENDATION - 37

1    showing that the supervisor had "knowledge of and acquiescence in [the] unconstitutional

2    conduct by his or her subordinates." *Starr*, 652 F.3d at 1207. If the plaintiff fails to show direct

3    involvement by the supervisor, or knowledge of and acquiescence in the alleged constitutional

4    violation, there will not be a viable claim of supervisor liability. *Id*. at 1243.

5         Plaintiff does not address his supervisory claim in his response or provide evidence to

6    support this claim against Defendants Julia Barnett, Areig Awad, Deborah Tonhofer, F. John

7    Smith and the State of Washington.[4] As Plaintiff has failed to make a sufficient showing on an

8    essential element of this claim, summary judgment in favor of Defendants is proper. *See Celotex*

9    *Corp v. Catett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("Under Rule

10   56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and

11   admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

12   any material fact and that the moving party is entitled to a judgment as a matter of law.'"

13   F.    *Respondeat Superior* – Count VII

14        Plaintiff asserts this claim against the State of Washington, claiming the state is liable for

15   the conduct of its defendant employees. Dkt. 1-2 at 39.

16        The Court recommends that Count VII of Plaintiff's Complaint be dismissed as vicarious

17   liability or *respondeat superior* is not a stand-alone cause of action but is a means of assigning

18   liability to the Defendants for their actions as to other common law causes of action. *See*

19   *Hollinger v. Titan Capital Corp*, 914 F.2d 1564, 1576–77 n. 28 (9th Cir.1990) (*Respondeat*

20   *superior* is a theory of liability rather than a separate cause of action.)

21

22

23

---

[4] Plaintiff's separate and direct claim of negligence against the State Defendants has been addressed separately herein.

REPORT AND RECOMMENDATION - 38

1

<u>CONCLUSION</u>

2    A.    <u>Defendants' Motion for Summary Judgment (Dkt. 40)</u> is **GRANTED in part** as follows:

3        1.    Eighth Amendment Deliberate Indifference (Count I): **granted** as to Defendants
     Julia Barnett, Jack Warner, Elke Jackson, Areig Awad, Cory Pruitt, Deborah Tonhofer,
4     Tim White, Jon Reyes, Kenny Hawkins, Carleen Grimes, Dwayne Evans, Jennifer
     Meyers, F. John Smith (deceased), Trina Ralston, and Jo Phillips.
5

6        2.    First Amendment Retaliation (Count II): **granted** as to Defendants Cory Pruitt,
     Deborah Tonhofer, Carleen Grimes, Dwayne Evans, Kenny Hawkins;

7        3.    Negligence (Count III): **granted** as to all individually named defendants **except**
     Defendants Robin Smith and Adelaide Horne;
8

9        4.    Failure to Supervise (Count VI): **granted** as to all Defendants;

10        5.    Respondeat Superior (Count VII): **granted** as to all Defendants;

11    And, **DENIED in part** as follows:

12        1.    Eighth Amendment Deliberate Indifference (Count I): **denied** as to Defendants
     Robin Smith and Adelaide Horne;

13        2.    First Amendment Retaliation (Count II): **denied** as to Defendant Tim White;

14        3.    Negligence (Count III): **denied** as to Defendants Adelaide Horne, Robin Smith,
     State of Washington, and DOC;
15

16        4.    Negligent Infliction of Emotional Distress (Count IV): **denied**.

17        5.    RCW 18.71 Medical Malpractice (Count V): **denied**.

18    B.    <u>Plaintiff's Motion for Partial Summary Judgment (Dkt. 43)</u>

19        **GRANTED in part** as Plaintiff's claims of negligence against Defendants Adelaide
     Horne, Robin Smith, State of Washington, and DOC; **DENIED** as to all other defendants.

20

<u>OBJECTIONS AND APPEAL</u>

21        This Report and Recommendation is not an appealable order.  Therefore, a notice of

22    appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

23    assigned District Judge enters a judgment in the case.

REPORT AND RECOMMENDATION - 39

1    Objections, however, may be filed and served upon all parties no later than **September**

2    **28, 2023**. The Clerk should note the matter for **September 29, 2023**, as ready for the District

3    Judge's consideration if no objection is filed.  If objections are filed, any response is due within

4    14 days after being served with the objections.  A party filing an objection must note the matter

5    for the Court's consideration 14 days from the date the objection is filed and served.  The matter

6    will then be ready for the Court's consideration on the date the response is due.  Objections and

7    responses shall not exceed twelve (12) pages.  The failure to timely object may affect the right to

8    appeal.

9

10    DATED this 14th day of September, 2023.

11    _____
      BRIAN A. TSUCHIDA
12    United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION - 40